## IN THE UNITED STATES DISTRICT COURT
## FOR MIDDLE DISTRICT OF TENNESSEE
### Nashville Division

|  |  |
|---|---|
| WORLD MEDIA ALLIANCE LABEL INC.<br><br>Plaintiffs,<br><br>v.<br><br>TUNECORE INC.;<br><br>BELIEVE SAS, aka BELIEVE Co., aka BELIEVE, aka BELIEVE DIGITAL;<br><br>OOO BELIEVE DIGITAL;<br><br>OOO IZDATELSTVO MONOLIT.<br><br>Defendants. | ACTION No.<br><br><br>**COMPLAINT<br>BASED ON COPYRIGHT INFRINGEMENT,<br>FOR INJUNCTIVE RELIEF AND DAMAGES** |

### NATURE OF THE ACTION

This is a civil action seeking damages, injunctive relief, and other remedies for copyright infringement under the copyright laws of the United States, 17 U.S.C. § 101 et seq. Plaintiff World Media Alliance Label Inc. (collectively, "Plaintiff") respectfully file this Complaint against Defendants TuneCore, Inc., Believe S.A., OOO Believe Digital, and OOO Izdatelstvo Monolit (collectively, "Believe–TuneCore"), and allege as follows. Plaintiff distributes sound recordings in physical formats, including vinyl records and CDs, throughout the United States, including in Florida and within this District. Plaintiff also distributes and/or licenses their sound recordings as digital audio files through authorized digital services, including Spotify, Apple Music, Amazon, Google Play, Deezer, YouTube, and other current or emerging digital distribution avenues available throughout the United States, including in Florida and within this District. Plaintiff

1

suffered damages caused by the defendants. Believe's headquarters have been in Paris, France. Believe was acquired in 2024–2025 by a consortium led by TCMI, Inc., a U.S. investment entity with offices at 250 Middlefield Rd, Menlo Park, CA 94025. That acquisition was completed in 2025, resulting in Believe S.A.'s delisting from the Paris Stock Exchange. Technology Crossover Management Inc. (TCV), a California-based investment firm, is the American participant in the consortium and has obtained substantial control over TuneCore-Believe S.A.

**PARTIES**

1. Plaintiff World Media Alliance Label Inc. ("WMA") is a Florida company with its principal place of business in Sunny Isles Beach, Florida. WMA and its assignees are the copyright owners of, or owners of exclusive trademark rights in, a substantial portion of popular sound recordings sold or otherwise commercially exploited in the United States, embodying the performances of highly successful recording artists of past and present. WMA invests substantial time, energy, and resources in discovering and developing artistic talent, as well as in marketing, licensing, and distributing high-quality sound recordings of its artists.

2. Defendant TuneCore, Inc. is a Delaware corporation with offices at 1227 17th Ave. S, Unit D, Nashville, TN 37212, and 63 Pearl Street, Box #256, Brooklyn, NY 11201; it has been registered as a foreign for-profit corporation in Tennessee since 2017 under entity No. 000882970, with its Tennessee registered agent Corporation Service Co., 2908 Poston Ave., Nashville, TN 37203-1312, and a registered Delaware address at 2711 Centerville Rd., Suite 400, Wilmington, DE. Since 2015, Believe S.A. has been an indirect parent of TuneCore, Inc. and has de facto operated TuneCore as its own business. Believe also wholly owns Believe Digital Holdings, Inc., which in turn wholly owns TuneCore, Inc. Believe lists TuneCore as part of its portfolio of brands used to offer solutions worldwide.

2

3.	Defendant Believe S.A. (also known as Believe Digital or Believe) is an international music distribution company headquartered at 24 rue Toulouse Lautrec, 75017 Paris, France, since its founding in 2005. Believe presents itself as a global commercial distributor of sound recordings. Believe was acquired in 2024–2025 by a consortium led by TCMI, Inc., with Technology Crossover Management Inc. (TCV) as the American participant; the acquisition was completed in mid-2025, and Believe S.A. was delisted from the Paris Stock Exchange. Believe was acquired in 2024–2025 by a consortium led by TCMI, Inc., a U.S. investment entity with offices at 250 Middlefield Road, Menlo Park, CA 94025, and the acquisition was completed in 2025, resulting in Believe S.A.'s delisting from the Paris Stock Exchange. Technology Crossover Management Inc. (TCV), a California-based investment firm, is the American participant in the consortium and has obtained substantial control over Believe S.A.

4.	Defendant OOO Believe Digital (in Cyrillic, Общество с Ограниченной Ответственностью Белив Диджитал) is a subsidiary of Believe S.A. located in Moscow, Russia, with an address at 109012, Moscow, Tverskoy municipal district, Maly Cherkassky Lane, Building 2, Unit 1/1, and Russian registration codes OGRN: 1137746018321 and KPP: 771001001; it is sued as an instrumentality of Believe S.A.

5.	Defendant OOO Izdatelstvo Monolit (in Cyrillic, ООО Издательство Монолит) is a leading partner of Believe S.A. in Moscow, Russia, located at Moscow, Ilyinka St. 4, Gostiny Dvor, Entrance 5, Business Center Capital, 4th floor, Office 415, with Russian registration OGRN: 1067760178716 and KPP: 771001001; it is sued as an instrumentality of Believe S.A. for obtaining claims to music works without a legal basis.

## JURISDICTION AND VENUE

3

7. Jurisdiction is proper under 28 U.S.C. § 1332 in this Court as Defendant TuneCore is [jurisdictional allegations as pleaded], and Plaintiff is incorporated in the State of Florida.

8. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). Upon information and belief, TuneCore-Believe distributed infringing music and video to third parties with the understanding and intent that third parties would make those music and video assets available in Tennessee and to residents of this District via online streaming or digital download services, and those infringing tracks were provided by those third parties to Tennessee residents.

9. TuneCore-Believe has used its ability to distribute music and video assets throughout the United States and globally as a selling point, in violation of WMA's rights, harming the marketability and licensing opportunities for Plaintiffs' copyrighted sound and video recordings within the United States and among Tennessee residents.

10. Venue is proper because TuneCore is registered in Tennessee as a foreign for-profit corporation and acts as the alter ego of its parent Believe in France and California; all Defendants, acting through TuneCore in Tennessee, have sufficient minimum contacts with Tennessee and this District.

11. TuneCore-Believe has purposefully directed electronic activity and distributed infringing music and video assets geared toward the U.S. market, for which they receive revenues corresponding to popularity in the U.S., thereby infringing Plaintiffs' copyrights

12. TuneCore–Believe distributes and/or licenses music and video recordings as digital files through authorized digital services, including Spotify, Apple Music, Amazon, Google Play, Deezer, YouTube, and other current or emerging digital avenues available throughout the United States, including within this District.

4

13. The effects of TuneCore–Believe's unlawful conduct are felt in the United States, including in this District and Florida, where Plaintiffs are registered.

14. TuneCore–Believe wrongfully monetizes royalties from a clientele of millions of users without any registration under the DMCA; see Exhibit B.

**FACTUAL ALLEGATIONS FOR ALL CAUSES OF ACTION**

A. <u>Defendants Systematically Distribute Tracks and Music Videos to Social Media Platforms and Other Digital Music Services Without Rights</u>

15. Plaintiffs own or have exclusive trademark rights to a catalog of music and video recordings from world-renowned recording artists, including, for example, Bad Style and Yuriy Shatunov (in Cyrillic letters Юрий Шатунов), which Defendants have infringed.

16. Plaintiffs have invested substantial money, time, effort, and creative talent to discover and develop artists and to create, promote, sell, and license sound recordings embodying the performances of their exclusive recording artists; they have also invested in a legitimate market for digital distribution through agreements with social media platforms and other digital music service providers, and Plaintiffs and their artists are compensated from streaming and distribution to the public.

17. From its inception, Believe and its subsidiaries including TuneCore recognized it lacked the resources, creative talent, and business acumen to sign and develop top-level artists and build a catalog capable of fairly competing with Plaintiffs, and therefore made the affirmative decision to enter into distribution contracts with TuneCore, a registered entity in Tennessee (and Delaware, New York, and California), achieving dramatic growth and profitability by operating as a hub for distribution of infringing copies of popular copyrighted recordings; this action seeks to stop TuneCore-Believe's ongoing infringements and conversion of the value of those recordings.

5

18. OOO Monolit (Monolit Records) is a Russian record label founded in 1994 by Anton Pronin and Yuri Slyusar, supported by Maxim Fadeev, and is one of the largest record companies in Russia; in 2007, it lost a lawsuit brought by the founder of Laskoviy May for illegal distribution of the group's recordings, and despite that judgment, it continued to violate Plaintiffs' copyrights while cooperating in bad faith with TuneCore–Believe, which has used its Moscow subsidiary to solicit contracts from purported rights holders, including Monolit, knowing they did not own the copyrights.

19. Defendants entered into contracts with "artists" or purported record companies authorizing TuneCore-Believe to market and distribute their sound recordings to the public; TuneCore-Believe distributes its catalog pursuant to licensing agreements with providers, including TikTok, YouTube, Spotify, Apple Music, Instagram, and hundreds of others, supplying and purporting to license its catalog to service providers, who deliver streams and downloads under color of the purported TuneCore-Believe licenses.

20. TuneCore–Believe distributes overtly infringing versions of original tracks by famous artists, labeled with notations such as "Extended Mix" or "Slow Version," as reflected in Exhibit A.

21. Plaintiffs have identified numerous tracks, as reflected in Exhibit B, that TuneCore-Believe distributed to social media platforms and other digital music services infringing Plaintiffs' recordings, and Plaintiffs expect discovery will reveal additional infringements and anticipate amending this Complaint and exhibits to identify additional works in suit.

22. TuneCore-Believe's illicit strategy to accumulate and monetize a vast catalog of infringing recordings has been successful; TuneCore-Believe has distributed millions of sound

6

recordings to digital service providers—more than the number of legitimate recordings distributed by Plaintiffs and other major and reputable independent labels combined.

23. Despite awareness that its business model is fueled by rampant piracy, TuneCore-Believe has eschewed basic measures to prevent copyright violations and disregarded that its catalog contains numerous infringing recordings.

24. TuneCore-Believe also wrongfully collects royalties it knows are payable to Plaintiffs and other rightful owners, including by exploiting YouTube's content management claiming system to assert ownership in numerous Plaintiffs' recordings, thereby diverting or delaying royalties.

25. TuneCore-Believe has continued to distribute the same tracks to other digital music service providers while changing and manipulating data—including artist name and metadata (title, composer, performer, release date, label)—and has intentionally created infringement notices and counter-notifications on its and partners' behalf, despite lacking legal rights, to seek royalties from providers, as reflected in Exhibit A.

26. As shown in Exhibit D, OOO Izdatelstvo Monolit has used TuneCore–Believe to distribute illegal material and abuse the distribution system by: (a) creating illegal releases via the TuneCore-Believe distribution system; (b) changing original artist names and song titles; (c) cutting or deleting starts/ends of original tracks to create modified versions; and (d) creating illegal copyright claims on YouTube's Content ID and other social networks, causing harm.

27. TuneCore-Believe's infringement has caused and continues to cause irreparable harm to Plaintiffs, their recording artists, and others whose livelihoods depend on lawful distribution; Plaintiffs seek a permanent injunction and damages of at least $100,000,000 for past and present willful infringement.

7

28. References to Plaintiff's sound recording copyrights include trademark rights, and references to TuneCore-Believe's infringement include violations of such rights, as reflected in Exhibit B.

29. Upon information and belief, TuneCore-Believe S.A. distributed infringing tracks to third parties, intending that those tracks be made available in Tennessee and Florida, including to residents of this District via online streaming or digital downloads, and those tracks were provided to Florida residents.

30. OOO Believe Digital is a Russian corporation with its principal place of business in Moscow, Russia. TuneCore-Believe has been using it as a local subsidiary in Russia.

31. Upon information and belief, since 2012, Believe S.A. has been an indirect parent company of Believe Distribution Services | Russia & CIS.

32. Believe S.A. holds OOO Believe Digital and has been integral to the growth of the Russian digital music market since 2012, with more than 40 people in its central Moscow office and in several regions of Russia and the CIS.

33. Defendants have allegedly violated Plaintiffs' copyrights and engaged in cyber-piracy, deriving millions of dollars in illegal income.

34. Upon information and belief, TuneCore-Believe S.A. distributed infringing tracks to third parties, intending those tracks to be made available in Florida, including to residents of this District, via online streaming or digital downloads, and those tracks were provided to Florida residents.

35. Upon information and belief, TuneCore-Believe S.A. has leveraged its ability to distribute tracks throughout the United States and globally as a selling point to its artists.

8

36. TuneCore-Believe S.A. has harmed the marketability and licensing opportunities for Plaintiffs' copyrighted sound recordings within Florida and among Florida residents, including this District.

37. Upon information and belief, TuneCore-Believe S.A. derives substantial revenue from operations in this District and in Florida, where Plaintiffs are registered.

38. TuneCore-Believe S.A. identifies TuneCore, Inc.'s Chief Executive Officer as a member of its leadership team, and TuneCore, Inc. and TuneCore-Believe S.A. offer joint terms of service for users of www.tunecore.com and www.believemusic.com.

39. In the alternative, this Court has personal jurisdiction over TuneCore-Believe S.A. pursuant to Federal Rule of Civil Procedure 4(k)(2) because: (a) Plaintiffs' claims arise under federal copyright law; (b) TuneCore–Believe distributes audio tracks at issue to multiple U.S. companies; (c) TuneCore–Believe purposefully directs electronic activity into the United States and distributes infringing tracks geared to the U.S. market for revenue; (d) they avail themselves of copyright management tools provided by YouTube LLC to claim interests and monetize videos; (e) they act with manifest intent to engage in U.S. business; and (f) the effects of their unlawful conduct are felt in the United States.

40. Defendants systematically distribute tracks and music videos to social media platforms and other digital music services without obtaining the necessary rights.

41. Defendants present themselves as global commercial distributors of sound recordings and video and have achieved dramatic growth and profitability by operating as a hub for distributing infringing copies of popular copyrighted recordings; Plaintiffs bring this action to address Defendants' massive ongoing infringements and attempts to convert the value of recordings to which they have no rights.

9

42. Plaintiffs and/or their assignees own trademark and exclusive rights to sound recordings from renowned artists, including Bad Style and Yuriy Shatunov (Юрий Шатунов), and have invested substantial sums and effort to develop artists and create, promote, sell, and license such recordings.

43. Plaintiffs have invested substantial resources in developing a legitimate market for digital distribution through agreements with social media platforms and digital service providers; Defendants and their recording artists are compensated through revenue from streaming and distribution.

44. Defendants recognized they lacked the resources, creative talent, and business acumen to sign and develop artists and build a competitive catalog, so they entered into contracts with artists or labels willing to sign basic form agreements, resulting in a client list overrun with fraudulent "artists" and pirate labels who rely on Defendants and their network to seed infringing copies across the digital ecosystem.

45. Defendants make little effort to hide their lack of copyright in nearly all instances and have no excuse for their illegal actions; Defendants' "artists" and recordings often bear the same names as Plaintiffs' artists and popular works, and Defendants have distributed infringing tracks from infringers such as Bad Style and Yuri Shatunov (Юрий Шатунов).

46. Plaintiffs have identified numerous infringing tracks distributed by Defendants to platforms and digital music services that infringe Plaintiffs' valuable recordings.

47. Defendants are fully aware that their business model is fueled by rampant cyber-piracy, have eschewed basic measures to prevent violations, and disregarded that their catalog is rife with infringing recordings.

10

48.     Defendants wrongfully collect royalties payable by digital music services to Plaintiffs and other rightful owners, exploiting YouTube's Content ID to assert ownership in numerous Plaintiffs' recordings to divert or delay royalties; even after YouTube conflicts were resolved in WMA's favor, Defendants continued to distribute the same tracks to other services and seek royalties.

49.     Defendants' infringement has caused and continues to cause irreparable harm to Plaintiffs and their artists; Plaintiffs seek a permanent injunction and at least $100 million in damages for past and present willful infringement.

50.     Plaintiffs hold internationally known music labels with worldwide contracts with performers, artists, and companies.

51.     Plaintiffs and their assignees are copyright and trademark owners of exclusive rights concerning sound recordings commercially exploited in the United States, embodying performances of successful recording artists past and present.

52.     In many instances, upon Plaintiffs' contesting TuneCore-Believe's asserted ownership in obviously infringing recordings, TuneCore-Believe did not contest Plaintiffs' claims, effectively conceding infringement of tracks it had distributed to YouTube.

53.     Despite Plaintiffs' ownership or distribution of recordings, TuneCore-Believe often continued to distribute and purport to license the same tracks to other services, including Spotify, Apple Music, Amazon Music, and TikTok, and continued collecting royalties, as exemplified in Exhibit A.

54.     Plaintiffs distribute their sound recordings and music videos throughout the United States, including in Florida and this District, and also distribute and/or license digital audio files through authorized services, including Spotify, Apple Music, Amazon, Google Play, Deezer,

11

YouTube, and others available throughout the United States, including in Florida and within this District.

55. To grow their business, Defendants amassed a vast catalog of sound and video recordings and distributed the content digitally across various markets.

56. To arrange distribution, Defendants enter agreements with service providers such as YouTube, Spotify, Apple Music, Amazon, and social media platforms, including Instagram and TikTok, purporting to license exploitation for specific periods and regions.

57. Defendants and their purported "artists" are not user-level uploaders to third-party platforms; as commercial distributors, they deliver content via direct electronic feeds ingested by service providers pursuant to distributor-platform arrangements.

58. A "feed" is a specialized bulk content delivery method requiring technical setup by distributor and platform provider and is distinct from user-facing upload methods.

59. Defendants monitor track success, including identifying "high-potential artists," and utilize copyright management systems such as YouTube's Content ID to claim ownership of recordings in distributed tracks and monetize such uses.

B. Defendants' Knowing and Willful Exploitation of Plaintiffs' Copyrighted Music

60. In pursuit of rapid growth, Defendants have relentlessly sought to distribute as much content as possible and, upon information and belief, have distributed millions of tracks or videos to digital service providers—vastly more than recordings collectively distributed by Plaintiffs, other major labels, and reputable independents.

61. Defendants knowingly adopted a business model distributing content received, including from questionable sources without copyright histories, without effective review to

12

identify infringing copies, resulting in a significant portion of distributed tracks blatantly infringing Plaintiffs' recordings.

62. At all relevant times, TuneCore-Believe knew it was distributing infringing tracks to social media platforms and other digital services.

63. Many infringing tracks distributed by TuneCore-Believe are "sped up" versions of Plaintiffs' popular recordings, often labeled with "sped up" or "speed" and referring directly to the underlying recording titles to evade platform checks, as shown in Exhibit A.

64. YouTube's Content ID system has informed Defendants of specific instances of infringement by identifying matches between recordings in which Defendants or Plaintiffs have claimed copyright interests.

65. Despite such notices, Defendants continued to distribute, monetize, and purport to license tracks embodying these recordings and compounded their misconduct through spurious ownership assertions hindering Plaintiffs' enforcement and payment.

66. Defendants used Content ID to claim ownership in Plaintiff's owned or distributed recordings in content Defendants distributed to YouTube, forcing Plaintiffs to incur the burden and expense of contesting claims; failure to contest would prevent monetization and divert revenue to Defendants; in many instances, Defendants conceded ownership only after contest.

67. Defendants often continued to distribute and purport to license the same tracks or videos to other services, including Spotify, Apple Music, Amazon Music, and TikTok, and on information and belief continued collecting royalties.

68. As distributor, Defendants had specific knowledge of infringement or at least were aware of facts indicating a high likelihood, yet continued distributing and purporting to license the same tracks, violating Plaintiffs' rights and diverting royalties.

13

<u>C. Defendants Benefit Directly from Distributing Infringing Tracks</u>

69.     Defendants' revenue is primarily driven by the size of their music and video catalog distributed across multiple digital ecosystems.

70.     Most of the Defendants' revenue has been from service providers' payments for the use of tracks and videos the Defendants distribute, which increase with views, streams, or downloads.

71.     Many of Defendants' most popular tracks and videos are infringing, including works and music videos of Plaintiffs that are highly popular among users, leading to increased revenues because some payments correspond to track popularity.

72.     Defendants have fraudulently claimed ownership of Plaintiffs' tracks and videos posted on YouTube, allowing Defendants to collect advertising revenue for third-party videos matching the claimed recordings.

73.     Defendants can supervise and control their infringing activities and those of service providers to which they distribute and purport to license infringing content; they control acceptance, distribution, and licensing, can delete or filter infringing content using available technology, and can cease services to infringing customers, yet refuse to do so.

<u>D. Harm to Plaintiffs Through Defendants' Exploitation of Their Copyrighted Music \ and Video Assets</u>

74.     Upon information and belief, Defendants' infringing tracks distributed and purportedly licensed have been streamed, viewed, downloaded, or reproduced in videos hundreds of millions of times across digital ecosystems, causing substantial and irreparable harm to Plaintiffs and their artists.

14

75. The Copyright Act protects plaintiffs' sound recordings and videos; commercial distribution is the principal revenue source to pay artists and to invest in discovering, developing, supporting, marketing, and promoting creative talent and works.

76. Defendants attempted to convert the value of Plaintiffs' works by knowingly distributing infringing copies and collecting royalties and other revenues, diverting payments that would otherwise have gone to Plaintiffs, including per-stream/view/download royalties and ad-sharing revenue.

77. Defendants' actions also deprive Plaintiffs and their artists of creative control over modifications and adaptations of their works—matters requiring consent under copyright law—undermining artistic integrity and determination of recasting.

78. Defendants' practice of using YouTube's Content ID to claim ownership of Plaintiffs' recordings has forced Plaintiffs to repeatedly contest frivolous assertions at the risk of losing monetary benefits from their own recordings.

E. Infringement of Copyright by Defendants

79. Defendants knowingly engage in repeated and pervasive infringement of Plaintiffs' exclusive rights to reproduce and distribute Plaintiffs' copyrighted sound and video recordings, including but not limited to those listed in Exhibit C.

80. Defendants' use on YouTube of the identified works infringes the copyright owners' rights in those works.

81. A list of URLs where the works are accessible online via online stores, attributed to Defendants, is attached as Exhibit B.

82. Exhibit C includes the Artist/Name/Trademark registered by Plaintiffs or their assignees.

15

<u>F. Other Instances of Systemic Infringement by Defendants</u>

83. The above examples are not exclusive; more specific information is annexed as Exhibit B and incorporated by reference.

84. Defendants have the legal right and practical ability to supervise and control infringing activities to which they distribute and purport to license infringing tracks and videos, because: (a) they reserve rights to terminate distribution and remove infringing content from third-party services; (b) infringing tracks and videos are present on Defendants' CMS before distribution, allowing policing and control; (c) Defendants track infringements through fingerprinting and monitor releases for metadata matching Plaintiffs' metadata; and (d) Defendants have the practical ability to identify and act against infringements.

<u>G. TuneCore and Believe Should Be Treated as a Single Hub for Infringing Copyright and Should Be Treated as an Alter Ego of Each Other for purposes of Infringement.</u>

85. As the evidence shows, TuneCore and its parent Believe operate as a single "hub" for purposes of copyright infringement.

86. The most salient illustration is the $500 million copyright infringement action filed in November 2024 by Universal Music Group (UMG), ABKCO, and Concord Music Group (U.S. District Court, Southern District of New York (Foley Square) CIVIL DOCKET FOR CASE #: 1:24-cv-08406-MMG). Joint liability allegations: the complaint names Believe and its subsidiary TuneCore, asserting they operate in concert as a centralized "hub" to distribute infringing copies of copyrighted works.

87. The vicarious infringement theory asserts that plaintiffs pursue vicarious copyright infringement on the premise that Believe, as the parent, possesses the right and ability to control TuneCore's activities and derives a direct financial benefit from the alleged infringement.

16

88.     Believe S.A. fully acquired TuneCore in 2015.  The operational overlap: notwithstanding distinct operations and personnel, Believe and TuneCore maintain integrated initiatives such as "Signed By," which enables artists to begin with TuneCore and be up-streamed to Believe's label services as their careers scale. Contractual unity: In instruments such as Terms & Conditions, the companies at times define themselves collectively as the "Distributor," while designating differing governing jurisdictions—the United States for TuneCore and the European Union for Believe.

89.     In 2025, a consortium led by Believe Founder and CEO Denis Ladegaillerie, along with American financial companies EQT X and TCV, finalized the acquisition of Believe S.A. for approximately €1.54 billion ($1.75 billion), taking the French digital music company private and out of U.S. control. The deal resulted in a "squeeze-out" to remove remaining public shares.  The consortium was formed in the U.S., and in 2025, it moved to acquire the remaining <4% of shares to complete the firm's delisting from Euronext Paris. The financing company's goal has been achieved. Believe as a private entity focused on profits.

**90.**     TuneCore and Believe satisfy the alter ego standard for purposes of infringement: to treat affiliated companies as alter egos and pierce the corporate veil, courts typically require proof of (a) unity of interest—i.e., absence of separate corporate personalities, evidenced by facts such as commingled funds, shared offices, or common officers—and (b) an inequitable result if separateness is respected, such as sanctioning fraud or promoting injustice. Although UMG's current suit proceeds against Believe and TuneCore together, its focus is on vicarious and contributory liability, which do not require establishing that the entities are the same legal person; rather, they turn on allegations that Believe controls and profits from TuneCore's misconduct.

//

## CAUSES OF ACTION
## COUNT I – INJUNCTION (17 U.S.C. Chapter 5 – Copyright Infringement and Remedies)
### (Against All Defendants)

91. Plaintiffs reference and incorporate the allegations in Paragraphs 1 to 90 and state as follows.

92. Defendants did not respond to Plaintiffs' warnings and demands and continue to use recordings to which Plaintiffs own commercial rights.

93. Relief is governed by 17 U.S.C. § 502, authorizing temporary and final injunctions to prevent or restrain infringement and providing nationwide enforceability.

94. Among other instances, Plaintiffs demanded the shutdown of an unofficial YouTube channel posting infringing material (www.youtube.com/channel/UCuIzwjfti6l3pQfpvnb8FMg) and related video links identified in Exhibit B.

95. A district court may grant injunctive relief upon showing: (1) substantial likelihood of success on the merits; (2) irreparable injury absent injunction; (3) the balance of harms favors the movant; and (4) the injunction serves the public interest.

96. As stated, Defendants have the legal right and practical ability to supervise and control infringing activities by: (a) reserving rights to terminate distribution and remove infringing content; (b) hosting infringing content on Defendants' CMS before distribution; and (c) tracking infringements via fingerprinting and metadata monitoring, giving them the practical ability to act.

97. Plaintiffs will suffer irreparable damage unless enjoined; Defendants' conduct is causing and will continue to cause significant irreparable injury not fully compensable at law; pursuant to 17 U.S.C. § 502, Defendants should be enjoined from infringing Plaintiffs' copyrights and exclusive rights.

18

98.     Plaintiffs are entitled to impoundment and destruction of all infringing copies of Plaintiffs' or their assignees' works from Defendants' management and control.

99.     Plaintiffs are entitled to relief as allowed by statute; Plaintiffs allege Defendants and their principal have systematically infringed numerous works without necessary rights and state a claim for a minimum of $100 million.

**COUNT II – CLAIM FOR DAMAGES (17 U.S.C. § 504 – Remedies for Infringement: Damages and Profits) (Against All Defendants)**

100.     Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 90 and state as follows.

101.     Defendants, without authorization or consent, reproduce and distribute copies of Plaintiffs' copyrighted sound and video recordings, including but not limited to those listed in Exhibit C; such reproduction and distribution are volitional and infringe Plaintiffs' exclusive rights under 17 U.S.C. § 106(1) and (3) as applicable.

102.     These infringements occur when Defendants reproduce infringing audio and video files without proper license authority and distribute those copies to digital music and video services without proper license or authority.

103.     Defendants knowingly engage in repeated and pervasive infringement of Plaintiffs' exclusive rights to reproduce and distribute Plaintiffs' copyrighted sound and video recordings, including but not limited to those listed in Exhibit B.

104.     Defendants have actual and constructive knowledge of, or are willfully blind to, the infringing activity because: (a) metadata in infringing copies distributed by Defendants references Plaintiffs' recordings; (b) Defendants monitor success and virality of distributed tracks and videos whose infringing nature is apparent from metadata and content; and (c) Defendants became aware

19

of conflicting ownership assertions through YouTube's Content ID but continued to distribute, monetize, and collect royalties.

105. Defendants are willfully blind, including by: (a) adopting a conscious business strategy of distributing and purporting to license tracks and videos with knowledge that many are infringing copies of Plaintiffs' works; and (b) maintaining and continuing to distribute recordings identified by YouTube's content-matching technology as closely similar to Plaintiffs' works.

106. Defendants induce, cause, and/or materially contribute to infringement through volitional acts, including: (a) reproducing infringing copies and enhancing metadata; (b) distributing infringing copies to service providers and purporting to license exploitation; and (c) tracking usage and collecting money from service providers for exploitation of Plaintiffs' recordings.

107. Each unauthorized reproduction and distribution of Plaintiffs' copyrighted sound and video recordings constitutes a separate and distinct act of infringement.

108. Defendants' acts are willful, intentional, and purposeful, in disregard of Plaintiffs' rights.

109. As a direct and proximate result, Plaintiffs are entitled to maximum statutory damages under 17 U.S.C. § 504(c), up to $150,000 per infringed work, or under § 504(b), to actual damages and Defendants' profits in amounts to be proven at trial.

110. Under 17 U.S.C. § 504, an infringer is liable for actual damages and profits or statutory damages, including enhanced damages up to $150,000 for willful infringement, with additional provisions and presumptions as stated by statute.

111. Accordingly, Plaintiffs are entitled to damages and profits against Defendants and to state an infringement claim.

20

## COUNT III – CLAIM FOR COSTS AND ATTORNEYS' FEES (17 U.S.C. § 505)
### (Against Defendants)

112. Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 90 and state as follows.

113. Under 17 U.S.C. § 505, the Court may, in its discretion, award full costs and reasonable attorneys' fees to the prevailing party; Plaintiffs have incurred and continue to incur costs and legal fees to enforce their rights against Defendants.

114. As detailed, Defendants engaged in repeated and pervasive infringement of Plaintiffs' exclusive rights in copyrighted and trademarked sound and video recordings, including those in Exhibit C; service providers to which Defendants distributed and purported to license Plaintiffs' recordings infringe when they reproduce, publicly perform, and further distribute Plaintiffs' recordings under color of ineffective licenses; Plaintiffs are entitled to seek costs and attorneys' fees, with amounts to be established at trial.

## COUNT IV – VICARIOUS COPYRIGHT INFRINGEMENT (17 U.S.C. § 101 et seq.)
### (Against TuneCore and Believe)

115. Plaintiffs repeat and reallege every allegation contained in Paragraphs 1 to 90 and further allege as follows.

116. Vicarious infringement occurs when a party has the right and ability to control infringing activity and receives a direct financial benefit; direct knowledge or active encouragement is unnecessary.

117. Artists and labels in TuneCore-Believe's supply chain are engaged in repeated and pervasive infringement of Plaintiffs' exclusive rights to reproduce and distribute Plaintiffs' copyrighted sound recordings and trademarks, including those listed in Exhibit B; service providers to which TuneCore-Believe distributed and purported to license Plaintiffs' recordings

21

infringe when they reproduce, publicly perform, and further distribute under color of ineffective licenses.

118. TuneCore-Believe is vicariously liable for these infringing acts.

119. TuneCore-Believe has the legal right and practical ability to supervise and control infringing activities of its artists, labels, and service providers because: (a) it reserves rights to terminate distribution agreements, decline distribution, and remove infringing tracks; (b) infringing tracks reside on TuneCore-Believe's servers before distribution; (c) TuneCore-Believe tracks infringement via fingerprinting and monitors trending releases for metadata matches; and (d) Believe has the practical ability to act against artists and labels engaged in infringement.

120. At all relevant times, TuneCore-Believe derived a direct financial benefit attributable to infringement, including through upstream and downstream licensing arrangements that entitle it to retain a percentage of royalties and/or revenue when infringing tracks are streamed, downloaded, or used in user videos.

121. Each unauthorized reproduction, distribution, and public performance of each of Plaintiffs' copyrighted sound recordings is a separate and distinct act of infringement.

122. TuneCore-Believe's acts of infringement are willful, intentional, and purposeful, in disregard of Plaintiffs' rights.

123. As a direct and proximate result, Plaintiffs are entitled to maximum statutory damages under 17 U.S.C. § 504(c), up to $150,000 per infringed work, or under § 504(b), to actual damages and TuneCore-Believe's profits to be proven at trial.

124. Plaintiffs are entitled to their costs and reasonable attorneys' fees under 17 U.S.C. § 505.

22

125. Plaintiffs are entitled to an order impounding and destroying all infringing copies of Plaintiffs' works.

126. TuneCore-Believe's conduct is causing, and unless enjoined will continue to cause, significant and irreparable injury not fully compensable at law; under 17 U.S.C. § 502, Plaintiffs are entitled to an injunction prohibiting infringement of Plaintiffs' copyrights and exclusive rights.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, to treat Defendants, at least TuneCore and Believe, as alter egos of each other and assert claims against all Defendants as follows:

a. Statutory damages under 17 U.S.C. § 504(c), up to the maximum per infringed work, for violations of Plaintiffs' rights under the Copyright Act and Plaintiffs' exclusive rights under 17 U.S.C. § 1401(a), or, in the alternative at Plaintiffs' election under 17 U.S.C. § 504(b), Plaintiffs' actual damages and Defendants' profits, in amounts to be proven at trial, and other statutory relief without limitation ;

b. Preliminary and permanent injunctions enjoining Defendants and their officers, agents, servants, employees, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert with them, from: (1) directly or indirectly infringing in any manner any of Plaintiffs' copyrights or other exclusive rights, including in Plaintiffs' copyrighted sound recordings and videos; (2) causing, contributing to, enabling, facilitating, or participating in infringement of any of Plaintiffs' copyrights or other exclusive rights; and (3) requiring prompt termination of any distribution agreements with artists who infringe Plaintiffs' copyrighted sound recordings or videos;

c. Impoundment and destruction of files embodying Plaintiffs' copyrighted sound recordings and videos;

d. Pre-judgment and post-judgment interest as allowed by law;

e. Recovery of Plaintiffs' attorneys' fees and full costs and disbursements in this action; and

f. Such other and further relief as the Court deems proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 6, 2026      Respectfully submitted,

**/s/ George Lambert** Pro Hac Admission Pending
George Lambert, Esq., FL Bar No. 1022697
The Lambert Law Firm
421 Poinciana Drive #1422
Sunny Isles Beach , FL 33160
electronic mail: office.law.323@gmail.com
(305) 938-0600
Attorney for World Media Alliance Label, Inc.

**/s/ John D. Schwalb**
John D. Schwalb (BPR No. 11671)
JOHN D. SCHWALB, PLLC
120 Third Avenue South
Franklin, TN 37064-2511
electronic mail: john@jdschwalb.com
(615) 794-7100

24